# UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| CITY OF ASHLAND, KENTUCKY and ASHLAND WATER WORKS, | MDL No.: 2873 |
| Plaintiffs | Master Docket No.: 2:18-mn-2873 |
| v. | JUDGE RICHARD GERGEL |
| 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); | Civil Case No.: 2:24-cv-00466-RMG |
| AGC CHEMICALS AMERICAS INC.; | DIRECT FILED COMPLAINT AND JURY DEMAND PURSUANT TO CASE MANAGEMENT ORDER NO. 3 |
| AMEREX CORP.; | |
| ARCHROMA U.S., INC.; | |
| ARKEMA, INC.; | |
| BASF CORPORATION; | |
| BUCKEYE FIRE EQUIPMENT COMPANY; | |
| CARRIER GLOBAL CORPORATION; | |
| CHEMDESIGN PRODUCTS, INC.; | |
| CHEMGUARD, INC.; | |
| CHEMICALS INCORPORATED; | |
| THE CHEMOURS COMPANY; | |
| THE CHEMOURS COMPANY FC, LLC; | |
| CHUBB FIRE, LTD.; | |
| CLARIANT CORPORATION; CORTEVA, INC.; | |
| DEEPWATER CHEMICALS, INC.; | |
| DUPONTDE NEMOURS, INC.; | |
| DYNAX CORPORATION; | |
| E. I. DUPONT DE NEMOURS AND COMPANY; | |
| KIDDE PLC, INC.; | |
| NATION FORD CHEMICAL COMPANY; | |
| NATIONAL FOAM, INC.; | |
| UNITED TECHNOLOGIES CORPORATION; | |
| TYCO FIRE PRODUCTS LP; and | |
| UTC FIRE & SECURITY AMERICAS CORPORATION, INC.; | |
| Defendants. | |

**PLAINTIFF'S COMPLAINT**

Plaintiff, CITY OF ASHLAND, KENTUCKY, and the ASHLAND WATER WORKS, (hereinafter "Plaintiff" or "Ashland"), by and through its undersigned counsel, brings this action against Defendants, 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), AGC Chemicals Americas, Inc., Amerex Corp., Archroma U.S., Inc., Arkema, Inc., BASF Corporation, Buckeye Fire Equipment Company, Carrier Global Corporation, ChemDesign Products, Inc., Chemguard, Inc., Chemicals Incorporated, The Chemours Company, The Chemours Company FC, LLC, Chubb Fire, Ltd., Clariant Corporation, Corteva, Inc., Deepwater Chemicals, Inc., DuPont de Nemours, Inc., Dynax Corporation, E. I. DuPont De Nemours and Company, Kidde PLC, Inc., Nation Ford Chemical Company, National Foam, Inc., United Technologies Corporation), Tyco Fire Products LP (individually and as successor-in-interest to The Ansul Company), and UTC Fire & Security Americas Corporation, Inc., and alleges as follows:

**SUMMARY OF THE CASE**

1.      Plaintiffs brings this action against Defendants to address contamination impacts to its natural resources, public properties, and facilities caused by Defendants' Aqueous Film Forming Foam (AFFF) products.

2.      AFFF contains per- and polyfluoroalkyl substances collectively known as "PFAS."[1] PFAS are man-made compounds that are toxic and persistent in the environment, do not biodegrade, move readily through soil and groundwater, and pose a significant risk to human health and safety,

_____

[1] "PFAS" includes but is not limited to: perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") and related chemicals, including but not limited to those that degrade to PFOA and/or PFOS, and including but not limited to C3-C-15 PFAS chemicals, such as perfluorohexanesulfonate (PFHxS), perfluorononanoate (PFNA), perfluorobutanesulfonate (PFBS), perfluorohexanoate (PFHxA), perfluoroheptanoate (PFHpA), perfluoroundecanoate (PFUnA), perfluorododecanoate (PFDoA), HFPA Dimer Acid (commonly known as GenX chemicals), and HFPA Dimer Acid Ammonium Salt (commonly known as GenX chemicals)

as well as the environment.

3.      Since the 1960's through present, Defendants collectively designed, manufactured, marketed, sold and/or distributed PFAS, PFAS precursors, and/or AFFF products containing PFOA, PFOS and/or their chemical precursors (collectively, "PFAS Products").

4.      Military bases, airports, fire stations, industrial plants, refineries, and fire training centers regularly used AFFF in training exercises as well as live fire emergency scenarios to suppress and extinguish Class B fuel fires since the 1960's.

5.      Defendants knew these toxic compounds would be released into the environment during fire protection, training, and response activities, even when used as directed and as intended by the Defendants.  Defendants also possessed knowledge that these chemicals would persist in the environment and would not degrade, posing an indefinite threat to public health.

6.      As a result of the occurrence of PFAS in the environment from Defendants' AFFF products, Plaintiff will incur costs to remediate its natural resources, public properties, and facilities, will be required to fund and implement considerable additional capital costs, and will incur future ongoing operational and maintenance costs, in order to remediate, remove, and/or treat for PFAS contamination.

## PARTIES

7.      Plaintiff, City of Ashland, is a local government of Kentucky with its primary place of business being at 1700 Greenup Ave, Ashland, KY 41101.

8.      Plaintiff owns and operates a public water system (PWS ID KY0100011) contaminated by Defendants' PFAS containing AFFF products.  Plaintiff also owns various other public properties, facilities, and natural resources which, upon information and belief, are more likely than not impacted by PFAS contamination from Defendants' AFFF Products.

9.     Plaintiff has standing to recover damages incurred as a result of Defendants' actions and omissions. Plaintiff has standing to bring all claims pled herein.

10.     Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold the PFAS Products/Components that have and continue to contaminate the groundwater, surface water, wastewater, stormwater, sediment, and soil, as well as public properties and facilities of Ashland:

    a.  Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation authorized to conduct business in Kentucky, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. 3M is the only company that manufactured and/or sold AFFF containing PFAS in the United States, including Kentucky.

        i.  From the 1960's through 2002, 3M manufactured, distributed, and sold PFAS bearing products including AFFF. For more than four decades, 3M researched, designed, developed, manufactured, marketed, sold, and distributed products and raw materials containing PFAS in Kentucky.

    b.  Defendant AGC Chemicals Americas, Inc. ("AGC America") is a corporation organized and existing under the laws of Delaware with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd. AGC America is registered to do and does business in Kentucky.

        i.  AGC America and/or its affiliates manufactured PFAS and surfactants for use in AFFF sold in Kentucky by those who designed, marketed, developed,

manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

c. Defendant, Amerex Corp. ("Amerex"), is an Alabama corporation organized and existing under the laws of Alabama and does business throughout the United States, including conducting business in Kentucky. Amerex has its principal place of business at 7595 Gadsden Highway, Trussville, AL 35173.

    i. In 2011, Amerex acquired Solberg Scandinavian AS, a European manufacturer of AFFF.

    ii. Upon information and belief, following this acquisition, Amerex designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

d. Defendant Archroma U.S., Inc. ("Archroma U.S.") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Archroma U.S., Inc. is registered to do and is doing business in Kentucky.

    i. Archroma US manufactured and sold PFAS and/or their precursors for use in AFFF sold in Kentucky by those who designed, marketed, developed,

manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

e.  Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema is registered to do business in Kentucky. Upon information and belief, Arkema, Inc. is the operating U.S. subsidiary of Arkema France, SA.

   i.  Arkema, Inc., designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

f.  Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. BASF is registered to do business in Kentucky.  Upon information and belief, Ciba-Geigy Corp., Ciba Inc., and BASF does and/or has done business throughout the United States, including Kentucky.

   i.  BASF, as a successor-in-interest to Ciba-Geigy Corp. and Ciba Inc., manufactured and sold PFAS for use in AFFF sold in Kentucky by those who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise

handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

g. Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. Buckeye does and/or has done business throughout the United States, including in Kentucky.

   i. Buckeye designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

h. Defendant Carrier Global Corp. is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, Carrier Global Corp. conducts business throughout the United States including Kentucky.

   i. Carrier Global Corp. inherited UTC's Fire & Security businesses, including the Chubb Fire and Kidde-Fenwall brands, when it was formed in March 2020. Carrier Global Corporation is the parent corporation of Kidde-Fenwal Inc., a manufacturer of AFFF which designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the

contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

i. Defendant ChemDesign Products, Inc. ("ChemDesign"), f/k/a "SpecialtyChem Acquisition Corp.", is a Texas corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.

    i. ChemDesign manufactured PFAS for use in AFFF products sold throughout the United States, including in Kentucky, by those who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

j. Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Chemguard is registered to do business in Kentucky.

    i. Chemguard designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

k. Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521.

    i.  Chem Inc. manufactured PFAS for use in AFFF products sold throughout the United States, including in Kentucky, by those who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

l.  Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours is registered to do business in Kentucky.

    i.  In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of PFASs and the products that contain PFASs.

    ii.  Chemours designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

m. Defendant The Chemours Company FC, LLC ("Chemours FC"), successor-in-

interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business located at 1007 Market Street Wilmington, Delaware, 19899. Chemours FC is registered to do business in Kentucky.

    i. Upon information and belief, Chemours FC is a successor-in-interest to Dupont Chemical Solutions Enterprise.

    ii. Chemours FC manufactured PFAS for use in AFFF products sold throughout the United States, including in Kentucky, by those who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

n. Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ.

    i. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc.

    ii. Upon information and belief, Chubb was part of UTC Fire & Security Americas Corporation, Inc.

    iii. Chubb Fire designed, marketed, developed, manufactured, distributed,

released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

o. Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205. Clariant is registered to do business in Kentucky.

  i. Clariant was a fluruotelomer manufacturer which produced fluorosurfactants for AFFF manufacturers that designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

p. Defendant Corteva, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Upon information and belief, Corteva, Inc. is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of the former DuPont. Corteva, Inc. is registered to do business in Kentucky.

  i. Corteva designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject

of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

q. Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801. Upon information and belief, this Defendant manufactured PFAS Products for use in AFFF sold throughout the United States, including in Kentucky.

    i. Deepwater Chemicals manufactured PFAS for use in AFFF products sold throughout the United States, including in Kentucky, by those who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

r. Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont, Inc.) ("New Dupont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805.

    i. Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont. DowDuPont, Inc. was subsequently divided into three publicly traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. ("New DuPont").

    ii. New Dupont designed, marketed, developed, manufactured, distributed,

released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

s.  Defendant Dynax Corporation ("Dynax") is a Delaware Corporation that conducts business throughout the United States including Kentucky. Its principal place of business is 103 Fairview Park Drive, Elmsford, New York, 10523-1544.

   i.  Dynax designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

t.  Defendant E. I. DuPont De Nemours and Company ("Old DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Old Dupont has done business throughout the United States, including in Kentucky where it is registered to do business.

   i.  Since the 1950's, Old Dupont manufactured and sold PFAS for the manufacture of AFFF that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

   ii.  In 2015, Old Dupont spun off its "Performance Chemicals" business to Chemours.

u.  Defendant Kidde PLC, Inc. is a Delaware corporation with its principal place of

business located at One Carrier Place, Farmington, Connecticut 06034. Upon information and belief, Kidde PLC, Inc. does and/or has done business throughout the United States, including in Kentucky.

    i. Upon information and belief, Kidde PLC was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

    ii. Kidde P.L.C. designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

v. Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715 and it does business throughout the United States including in Kentucky.

    i. Nation Ford manufactured PFAS for use in AFFF products sold throughout the United States, including in Kentucky, by those who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

w. Defendant National Foam, Inc. ("National Foam") is a Delaware corporation with its principal place of business located at 141 Junny Road, Angier, North Carolina

27501 and does business throughout the United States, including in Kentucky.

    i.  National Foam is a subsidiary of Angus International Safety Group, Ltd. Upon information and belief, National Foam manufactures the Angus brand of AFFF products.

    ii.  National Foam designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

x.  Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. Tyco acquired Chemguard in 2011.

    i.  Tyco is a subsidiary of Johnson Controls International, plc, an Irish public limited company.

    ii.  Tyco is the successor-in-interest to the company formerly known as The Ansul Company ("Ansul") and manufactures the Ansul brand of products (Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul").

    iii.  Upon information and belief, Tyco/Ansul does and/or has done business throughout the United States, including in Kentucky.

    iv.  Tyco/Ansul designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject

of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

y.  Defendant United Technologies Corporation ("United Technologies") is a Delaware corporation with its principal place of business at 10 Farm Springs Road, Farmington, Connecticut 06032. United Technologies does and/or has done business throughout the United States, including in Kentucky.

   i.  Upon information and belief, Kidde-Fenwall, Inc. is part of the UTC Climate Control & Security unit of United Technologies.

   ii.  United Technologies designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

z.  Defendant UTC Fire & Security Americas Corporation, Inc. (F/K/A GE Interlogix, Inc.) ("UTC") is a North Carolina corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092.  UTC does and/or has done business throughout the United States, including in Kentucky.

   i.  UTC designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in the contamination of Plaintiff's public water system, landfill, wastewater, and natural resources.

11.  Any and all references to a Defendant or Defendants in this Complaint include any

predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

12.     When the term "Defendants" is used alone, it refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## **JURISDICTION AND VENUE**

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and Defendants, and the amount in damages exceeds the minimal jurisdictional limits of this Court.

14.     This Court has personal jurisdiction over the Defendants as Defendants have engaged in regular, systematic, and substantial economic activities in Kentucky.  These continuous activities, including marketing, selling, and/or distributing AFFF or components to manufacture AFFF, are connected to the Plaintiff's claims as alleged herein.

15.     Venue is appropriate in this judicial district pursuant to this Court's Case Management Order No. 3 ("CMO 3"). Plaintiff states that but for CMO 3 permitting direct filing in the United States District Court for the District of South Carolina, Plaintiff would have filed this Complaint in the United States District Court for the District of Kentucky. Further, in accordance with CMO 3, Plaintiff hereby designates the United States District Court for the District of Kentucky as the "Home Venue" as this case may have originally been filed there.

16.     Home Venue is proper in the United States District Court for the District of Kentucky

pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiff is a governmental entity and a substantial part of the property that is the subject of this action is situated in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS

### A. AQUEOUS FILM FORMING FOAM - AFFF

17.    The first firefighting foam was developed in 1902 by Russian engineer and chemist Aleksandr Loran.  Loran was working in the oil and gas industry trying to find a substance to combat petroleum-based fires for which water is ineffective.  Loran's solution was the first firefighting foam which was able to extinguish oil and other flammable liquids-based fires by blanketing and smothering them.

18.    Later iterations of AFFF utilized Per- and polyfluoroalkyl substances (PFAS) as a more effective means of suppressing hydrocarbon fuel-based fires.  PFAS are a group of manufactured chemicals used to make fluoropolymer coatings and products that resist heat, oil, stains, grease, and water.

19.    Scientists first developed processes to commercially produce PFAS in the 1940s. In the 1950's, Defendant 3M started manufacturing the two most well-known and well-studied types of PFAS, namely Perfluorooctanoic acid (PFOA) and Perfluorooctanesulfonic acid (PFOS).  PFOA and PFOS became popular for product applications because the fluoropolymer coatings allowed for the repelling of water, protecting of surfaces and resisting of heat, amongst other desirable properties.

20.    Certain PFAS like PFOA and PFOS are a significant environmental concern because these substances do not break down, thus allowing them to move through soils and contaminate drinking

water sources, as well as build up (bioaccumulate) in crops and wildlife.

21.    In training and emergency use, firefighters would spray AFFF containing PFAS directly onto a petroleum-based fire, where the foam coats the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

22.    AFFF can be made without PFOA, PFOS, or their precursor chemicals. Fluorine-free foams and short-chains foams do not release PFOA, PFOS, and/or their precursor chemicals into the environment.   However, the AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants contained either or both PFOA and PFOS, or their chemical precursors.

23.    PFOS and/or the chemical precursors to PFOS contained in 3M's AFFF were manufactured by 3M's patented process of electrochemical fluorination ("ECF").

24.    All other Defendants manufactured PFASs for use in AFFF through the process of telomerization. Telomerization produced fluorotelomers, including PFOA and/or the chemical precursors to PFOA.

25.    When used as the Defendants intended and directed, Defendants' AFFF releases PFOA, PFOS, and/or their precursor chemicals into the environment. PFAS do not exist in nature and are entirely man-made substances.

26.    Once PFOA and PFOS are free in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions and are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

**B. THE CONTAMINANTS: PFOA & PFOS**

27.    PFOS and PFOA are the most widely studied of the PFAS chemicals because they are the two PFAS that have been produced in the largest amounts within the United States.   PFOA and

PFOS are man-made chemicals within a class known as perfluoroalkyl acid ("PFAA"). PFAAs are part of the larger chemical family known as per- and polyfluoroalkyl substances ("PFAS").

28.    PFOS and PFOA are extremely persistent in the environment and resistant to typical environmental degradation processes primarily because the chemical bond between the carbon and fluorine atoms is extremely strong and stable.  PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. This bond is one of the strongest chemical bonds in nature and the resulting persistence has earned these synthetic substances the nickname "forever chemicals".

29.    PFOA and PFOS are soluble and readily transportable via air and water.  PFOA and PFOS will leach from the surface into groundwater where PFOA and PFOS are chemically stable and resist degradation

30.    The use of Defendants' PFAS Products as directed and intended by the Defendants allowed PFOA, PFOS, and/or their precursor chemicals to enter the natural resources, facilities, and public properties of Ashland where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the surface water, soil, sediment, and groundwater, as well as causing other extensive and ongoing damage to Plaintiff.

31.    Due to these 'forever chemicals' persistent nature, these substances have, and will continue to cause injury and damage to Plaintiff.

### C.  PFOA & PFOS HEALTH EFFECTS

32.    The majority of research on the potential human health risks of PFAS are associated with oral (ingestion) exposure. Limited data exist on health effects associated with inhalation or dermal exposure to PFAS. Most available toxicity data are based on laboratory animal studies. There are also several human epidemiological studies of PFOA and PFOS. Exposure to some PFAS above

certain levels may increase risk of adverse health effects.

33.    The available epidemiological and animal studies[2] suggest links between PFAS exposure and several negative health outcomes including:

      a.  Hepatic Effects (increased cholesterol, increased liver weight; hypertrophy);

      b.  Cardiovascular Effects (pregnancy-induced hypertension and pre-eclampsia)'

      c.  Endocrine Effects (thyroid disease);

      d.  Immune Effects (decreased vaccine response);

      e.  Respiratory Effects (asthma, COPD, bronchitis);

      f.  Reproductive Effects (decreased fertility);

      g.  Skeletal Effects (osteoarthritis);

      h.  Developmental Effects (decreased birth weight)

      i.  Carcinogenic Effects (kidney, liver, testicular, prostate, non-Hodgkin's lymphoma)

34.    Under the EPA's Guidelines for Carcinogen Risk Assessment (USEPA, 2005b), there is "suggestive evidence of carcinogenic potential" for PFOA.[3]

35.    Similarly, the International Agency for Research on Cancer (IARC) classifies PFOA as "possibly carcinogenic to humans".[4]  Higher PFOA serum levels may be associated with testicular, kidney, prostate, and ovarian cancers and non-Hodgkin lymphoma.[5]

36.    Increases in prostate, kidney, and testicular cancers have been found in workers or in

---

[2] See ATSDR "Toxicological Profile for Perfluoroalkyls, Draft for Public Comment" (2018) found online at https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf
[3] EPA, "Guidelines for Carcinogen Risk Assessment" EPA-630-P-03-001F (2005).
[4] International Agency for Research on Cancer (IARC), "Agents Classified by the IARC Monographs, volumes 1-125" (2019); IARC "Monographs on the Identification of Carcinogenic Hazards to Humans" (2019).
[5] Vieria et al., "Perfluorooctanoic Acid Exposure and Cancer Outcomes in a Contaminated Community: A Geographic Analysis" Environ Health Perspect. 121(3): 318–323 (2013).

community members living near a PFOA facility.[6]

37.    Animal studies for PFOA report developmental effects (survival, body weight changes, reduced ossification, delays in eye opening, altered puberty, and retarded mammary gland development), liver toxicity (hypertrophy, necrosis, and effects on the metabolism and deposition of dietary lipids), kidney toxicity (weight), immune effects, and cancer (liver, testicular, and pancreatic).[7] The animal toxicity studies available for PFOA also demonstrate that the developing fetus is particularly sensitive to PFOA-induced toxicity. Human epidemiology data report associations between PFOA exposure and high cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and cancer (liver, testicular, and kidney).

38.    For PFOS, epidemiological studies have reported associations between PFOS exposure and high serum cholesterol and reproductive and developmental parameters.    Exposure to PFOS has caused hepatotoxicity, neurotoxicity, reproductive toxicity, immunotoxicity, thyroid disruption, cardiovascular toxicity, pulmonary toxicity, and renal toxicity in laboratory animals and many in vitro human systems.[8] These results and related epidemiological studies confirmed the human health risks of PFOS, especially for exposure via food and drinking water. Applying the EPA Guidelines for Carcinogen Risk Assessment, there is suggestive evidence of carcinogenic potential for PFOS.[9]  Studies in animals have shown that PFOA and PFOS can cause cancer in the liver, testes, pancreas, and thyroid.

---

[6] ATSDR, "Public Health Statement, Perfluoroalkyls" (2015).
[7] EPA, "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)" EPA 822-R-16-004 (2016).
[8] Zeng, et al, "Assessing the human health risks of perfluorooctane sulfonate by in vivo and in vitro studies" Environment International Volume 126, May 2019, Pages 598-610 (2019).
[9] EPA, "Guidelines for Carcinogen Risk Assessment" EPA-630-P-03-001F (2005).

### D. PFOA & PFOS ENVIRONMENTAL EFFECTS

39. Due to the characteristics of these synthetic chemicals, PFOA and PFOS are a significant threat to drinking water supplies in the U.S. The natural breakdown of PFOA and PFOS over time is assumed to be virtually nonexistent. In addition to a resistance to natural degradation, PFOA/PFOS' highwater solubility causes significant mobility in soil and an affinity to leaching into groundwater. This problem is particularly magnified with respect to any municipality drawing its drinking water from an aquifer underlying a current or former military base or airport.

40. Once the "forever chemicals" PFOS and PFOA contaminate a groundwater source, water treatment will be necessary to resolve any threats to public health. Unfortunately, PFOS and PFOA resist most conventional chemical and microbial treatment technologies. Technologies with demonstrated effectiveness include granular activated carbon sorption and ion exchange resins.[10]

41. The most common treatment method for PFOA and PFOS contaminated groundwater is extraction and filtration through granular activated carbon. However, because PFOA and PFOS have moderate absorbability, the design specifics are very important in obtaining acceptable treatment.[11] Other potential adsorbents include: ion exchange resins, organo-clays, clay minerals and carbon nanotubes.[12] Evaluation of these sorbents needs to consider regeneration, as the cost and effort required may be substantial. Other *ex situ* treatments including nanofiltration and reverse osmosis units have been shown to remove PFASs from water. Incineration of the

---

[10] EPA, "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)" EPA 822-R16-004 (2016); EPA, "Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)." EPA 822-R-16- 005 (2016).

[11] EPA, "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)" EPA 822-R16-004 (2016); EPA, "Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)." EPA 822-R-16- 005 (2016).

[12] EPA, "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)" EPA 822-R16-004 (2016); Espana, V.A., Mallavarapu, M., and R. Naidu. "Treatment Technologies for Aqueous Perfluorooctanesulfonate (PFOS) and Perfluorooctanoate (PFOA): A Critical Review with an Emphasis on Field Testing." Environmental Technology & Innovation. Volume 4. Pages 168 to 181. (2015).

concentrated waste would be needed for the complete destruction of PFAS.[13]

42.     The costs of decades of PFAS contamination are enormous to public health, the environment, and to state and federal coffers.  Federal, state and local governments have only just begun to scratch the surface of identifying PFOA/PFOS contamination.  These governmental entities have to budget for environmental investigations, assessments, inspections and monitoring; cleanup, remediation and waste disposal; water filtration and alternative drinking water supplies; health monitoring and biomonitoring; fish sampling; and wastewater and landfill leachate treatment.

### E. DEFENDANTS' KNOWLEDGE AND CONCEALMENT OF RISKS TO PUBLIC HEALTH AND THE ENVIRONMENT

43.     Not long after introducing these "forever chemicals" into regular use, the military and scientists within the 3M Company began to question the environmental impacts of AFFF.

44.     Upon information and belief, in 1975, 3M scientists were made aware that PFAS chemicals were bioaccumulating in the bodies of US citizens across the nation.

45.     Studies have found PFOS and PFOA in the blood samples of the general human population and wildlife, indicating that exposure to the chemicals is widespread.[14]

> a.  The wide distribution of PFAS in organisms is strongly suggestive of the potential for bioaccumulation and/or bioconcentration.

46.     In 1978, a report again identified environmental and public health risks posed by AFFF

---

[13] Minnesota Department of Health (MDH) "MDH Evaluation of Point-of-Use Water Treatment Devices for Perfluorochemical Removal. Final Report Summary." (2008); Vecitis, C.D., Park, H., Cheng, J., and B.T. Mader "Treatment Technologies for Aqueous Perfluorooctanesulfonate (PFOS) and Perfluorooctanoate (PFOA)." Frontiers of Environmental Science & Engineering in China. Volume 3(2). Pages 129 to 151. (2009).

[14] US Department of Health and Human Services - Agency for Toxic Substances and Disease Registry. 2018. "Draft Toxicological Profile for Perfluoroalkyls"; EPA 2015, "Long-Chain Perfluoroalkyl Carboxylate and Perfluoroalkyl Sulfonate Chemical Substances; Significant New Use Rule." Proposed Rule. 40 CFR 721. Federal Register: Volume 80 (No. 13).

and noted the "difficulties obtaining adequate information" from 3M.[15]  It is believed at this time 3M was finding PFAS chemicals at levels 1,000 times normal in the blood of its workers and in the flesh of fish surrounding its manufacturing plants.

47.    Other manufacturers of AFFF also observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers. Upon information and belief, despite 3M concluding that PFOA and PFOS "should be regarded as toxic," 3M determined that the "risks should not be reported at this time."

48.    Upon information and belief, additional animal studies conducted by 3M in 1978 and 1979 further confirmed the public health and environmental risks posed by PFOS and PFOA.

49.    In 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.

50.    By the early 1980s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when sprayed in the open environment per the instructions given by the manufacturer, PFOA and PFOS readily migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

51.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had

---

[15] Department of the Navy, "Candidate Environmental Impact Statement - Discharging Aqueous Film-Forming Foam (AFFF) to Harbor Waters During Tests of Machinery Space Fire-Fighting Foam Systems Aboard U.S. Navy Ships" (1978).

birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[16]

52.    Defendants also knew or reasonable should have known that PFOA and PFOS could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.[17]

53.    By 1983 3M's medical officer warned in an internal memo "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

54.    Despite the substantial evidence that AFFF was an environmental and public health threat for decades, it was not until 2000 that the EPA announced that "(f)ollowing negotiations between EPA and 3M, the company...announced that it will voluntarily phase out and find substitutes for PFOS".[18]  Along with the announcement of the phase out of PFOS, it was revealed that a 3M animal study revealed significant health risks associated with PFOS exposure even at low doses.

55.    From 1951, DuPont, and on information and belief, Chemours, designed, manufactured, marketed, and sold PFAS Products, including Teflon nonstick cookware, and more recently PFAS feedstocks for the use in the manufacture of AFFF products.

56.    Based on information and belief, in 2001 or earlier, DuPont manufactured, produced, marketed, and sold PFAS Products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their AFFF products that were discharged into the environment and

---

[16]  See Memorandum "C-8 Blood Sampling Results, Births and Pregnancies," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.
[17]  *See* Memorandum "Organic Fluorine Levels," August 31, 1984, available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.
[18]  EPA News Release, "EPA and 3M ANNOUNCE PHASE OUT OF PFOS" (2000) found at https://archive.epa.gov/epapages/newsroom_archive/newsreleases/33aa946e6cb11f35852568e1005246b4.html

contaminated public properties, facilities, and natural resources of Ashland.

57.    DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[19]

58.    By July 2011, DuPont's "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified DuPont of a "probable link" between PFOA exposure and the conditions of pregnancy-induced hypertension and preeclampsia.  By October 2012, the C8 Science Panel had notified DuPont of a probable link between PFOA and five other conditions— high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

59.    In July 2015, DuPont spun off its chemicals division by creating Chemours as a new publicly-traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

60.    Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, distributed, and/or sold PFAS Products; (2) issued instructions on how PFAS Products should be used and disposed of (namely, by washing the foam into the soil or wastewater system), thus improperly permitting PFOA and/or PFOS to contaminate the surface water, soil, wastewater, storm water, and groundwater in and around Ashland; (3) failed to recall and/or warn the users of PFAS Products, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of surface water, soil, and groundwater contamination as a result of standard use and disposal of these products; and (4) further failed and refused to issue

---

[19] *See*, *e.g.,* Fred Biddle, "DuPont confronted over chemical's safety," *Wilmington News Journal* (Apr. 13, 2003). The *Wilmington News Journal* is published in Wilmington, Ohio.

the appropriate warnings and/or recalls to the users of PFAS Products, notwithstanding the fact that Defendants knew the identity of the purchasers of the PFAS Products.

61.    At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

62.    As a direct result of Defendants' actions and/or inactions alleged in this Complaint, upon information and belief the drinking water sources, wastewater, sewer storm water, groundwater, surface waters, soil, and sediment in Ashland have been and will continue to be contaminated with PFAS, including PFOA and PFOS, creating an environmental hazard, unless such contamination is remediated and drinking water supply sources are regularly sampled. As a direct and proximate result of Defendants' actions and/or inactions, Plaintiff must assess, evaluate, investigate, monitor, remove, clean up, correct, treat, and remediate PFOA and PFOS contamination of its drinking water supply at significant expense, loss, and damage.

63.    Defendants manufactured, designed, transported, and/or sold AFFF that was used in Ashland.  At various times dating back to the 1960s, AFFF has been stored, used, and/or discharged in Ashland leading to contamination of Plaintiff's public properties, facilities, and natural resources including groundwater.

64.    Defendants had a duty and breached their duty to evaluate and test such PFAS Products adequately and thoroughly to determine their potential human health and environmental impacts before they sold such products. They also had a duty and breached their duty to minimize the

environmental harm caused by PFAS Products.

65.     Defendants have known for decades that PFAS are toxic and because AFFF contains PFAS, the release of AFFF poses substantial health and environmental risks. Notwithstanding that knowledge, Defendants persistently and intentionally hid the danger of AFFF from consumers and the public.

66.     Defendants knew, foresaw, and/or reasonably should have known and/or foreseen that PFAS from AFFF Products would contaminate and harm the public health, safety, welfare, natural resources, public properties, facilities and the environment of Ashland.

67.     Instead of disclosing the dangers associated with PFAS used in AFFF, Defendants went to great lengths to falsely promote AFFF as being safe and appropriate for widespread use.

68.     Defendants repeatedly assured and represented to governmental entities, to consumers, and to the public that AFFF exposures presented no risk of harm and were of no legal, toxicological, or medical significance of any kind.

69.     At all relevant times, Defendants shared and/or should have shared among themselves, all relevant information relating to the presence, bio-persistence, and bioaccumulation of PFAS from AFFF in the environment and in human blood and associated toxicological, epidemiological, and/or other adverse effects and/or risks.

70.     At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing Plaintiff from discovering the existence and extent of any harm as alleged herein.

71.    At all times pertinent herein, Plaintiff did not know nor should it have known of the ongoing contamination the natural resources, public properties, and facilities of Ashland by PFAS containing AFFF Products as Defendants did not disclose the toxic nature and harmful effects of the AFFF which Defendants designed, manufactured and sold with PFOA and/or PFOS.

72.    Plaintiff discovering the claims pled herein within one year of the tolling of statutes of limitations or repose.

73.    At all relevant times, Defendants, through their acts and/or omissions, took steps to attack, challenge, discredit, and/or otherwise undermine any scientific studies, findings, statements, and/or other information that proposed, alleged, suggested, or even implied any potential adverse environmental damage and health effects or risks and/or any other fact of any legal, toxicological, or medical significance associated with the presence of PFAS in the environment and human blood.

74.    At all relevant times, Defendants, through their acts and/or omissions, concealed and/or withheld information from their customers, governmental entities, and the public that would have properly and fully alerted the Plaintiff to the environmental, toxicological, medical, or other significant risks from PFAS contamination.

75.    At all relevant times, Defendants encouraged the continued and increased use and release of AFFF, which caused the release of PFAS into the environment of Ashland by their customers and others, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with AFFF containing PFAS.

76.    Defendants' actions have contaminated and harmed the public health, safety, welfare, natural resources, public properties, facilities, and the environment of Ashland.

## F.  **Dupont's Fraudulent Transfer Scheme Designed to Avoid Liability**

77.     In approximately 2014, DuPont formed Chemours as a wholly-owned subsidiary. At that time, Chemours apparently had a board of directors, but that board was controlled by DuPont.

78.     In July of 2015, DuPont transferred its "performance chemicals" business to The Chemours Company. Around the same time, The Chemours Company FC, LLC was formed as a subsidiary of The Chemours Company. The transfer of the "performance chemicals" business included at least titanium technologies, fluoroproducts, and chemical solutions. The fluoroproducts and chemical solutions transfers appear to have been made to The Chemours Company and the Chemours Company FC, LLC (again, collectively "Chemours").

79.     In addition to the transfer of these business lines, Chemours assumed various liabilities for DuPont's prior use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities that Chemours took on are not publicly available.

80.     The DuPont-Chemours transfer included incredible amounts of debt and multiple failing product lines. Significantly, DuPont pinned on Chemours its historic (and future) environmental liabilities, which were known by DuPont to be massive. Chemours did not receive a reasonably equivalent value in exchange for this transfer or obligation. Likewise, the assets transferred to Chemours were unreasonably small in relation to the business or transaction. DuPont knew or reasonably should have known that Chemours would incur debts beyond its ability to pay them when they became due.

81.     At the time of the DuPont-Chemours transfer, the DuPont performance chemicals business held an estimated debt of approximately $4 billion.

82.     At that same time, DuPont announced that it planned to phase out production and use of PFOA, a major component of its fluoroproducts line, by 2015.

83.    Per the Separation Agreement governing the DuPont-Chemours transfer, Chemours agreed to indemnify DuPont against, and assumed for itself, all of DuPont's liabilities from DuPont's performance chemicals business, with no time limitation. This indemnification remains uncapped. Chemours also agreed to indemnify DuPont against and assume for itself the performance chemical liabilities without regard to the nature of the liabilities, when they were incurred or arose, or which entity is named as the responsible party. Chemours further agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the performance chemicals business, which would be based on a determination made by DuPont that the liability was 50.1% attributable to DuPont's performance chemicals operations.

84.    Chemours also agreed to substitute itself for DuPont with regard to any order, decree, judgment, agreement or action relating to the environmental liabilities it assumed.

85.    At the time of the DuPont-Chemours spin-off in 2015, DuPont was fully aware of its potential liabilities related to PFAS contamination throughout the United States.

86.    Until the completion of the spinoff, Chemours was a wholly-owned subsidiary of DuPont, and even though Chemours had a separate board, the board was controlled by DuPont. After the spin-off, new members of the Chemours board were appointed. The spin-off and related decisions were conducted while DuPont controlled the board. The new Chemours board did not take part in the separation.

87.    DuPont's knowledge and assessment of its liabilities—including environmental and other performance chemicals liabilities—have been comprehensive since it began its performance chemical operations, and its litigation-related liabilities have been increasing since at least the early 2000's. For example, in 2005, DuPont agreed to pay $16.5 million to resolve claims brought by

the EPA for violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act related to its PFAS compounds. Although seemingly small, this was the largest such PFC-related penalty in history at the time it was levied.

88.    Relatedly and also in 2005, DuPont incurred hundreds of millions of dollars of liability related to litigation against it for the health risks of its PFOA use and disposal in Ohio and West Virginia, which had caused thousands of people to receive serious medical diagnoses, including cancer, attributable to DuPont's PFCs.

89.    In 2016, Chemours itself acknowledged in an SEC filing that the anticipated outcomes in the Ohio litigation could materially and adversely affect Chemours' financial positions in terms of its operations and liquidity.

90.    Subsequently, DuPont and Chemours agreed to pay $671 million to resolve the Ohio claims. Chemours and DuPont each additionally agreed to pay $25 million annually for future PFOA-related costs not covered by the settlement for the following five years.

91.    At the time of the DuPont-Chemours spin-off, DuPont had been sued, had been on notice of impending suits, and/or actually knew of likely litigation and its liability for damages and injuries from the manufacture of PFAS and products that contain PFAS. Chemours' assumptions of liability were not limited to PFAS-related conduct; it also assumed various environmental liabilities related to prior, pending, and future litigation regarding other performance chemicals, such as benzene.

92.    The intent and effect of creating Chemours was to allocate an enormous portion of DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products. DuPont and Chemours effectuated this spin-off with the knowledge that Chemours would be insolvent and would not be able to bear the liabilities that DuPont transferred to

Chemours. DuPont and/or Chemours engaged in this process with the actual intent to deceive. This fraudulent conveyance has likely limited the availability of funds to cover DuPont's liability, including for the claims that arise out of this case, which has and will further harm Plaintiff.

**G.  Federal Regulation of PFAS**

93.     The has proposed National Primary Drinking Water Regulations and issued multiple health advisories for various PFAS over the last fifteen years.

94.     The USEPA may publish health advisories for contaminants that are not subject to any national primary drinking water regulation. 42 U.S.C. 300g–1(b)(1)(F). USEPA develops health advisories to provide information on the chemical and physical properties, occurrence and exposure, health effects, quantification of toxicological effects, other regulatory standards, analytical methods, and treatment technology for drinking water contaminants. USEPA health advisories describe concentrations of drinking water contaminants at which adverse health effects are not anticipated to occur over specific exposure durations.

95.     In 2009, under the authority of 42 U.S.C. 300g–1(b)(1)(F), the USEPA's Office of Water issued its Provisional Health Advisory for short-term exposure to contaminated drinking water at values of 400 ppt for PFOA and 200 ppt for PFOS based on available evidence at that time.

96.     In 2014, USEPA released its Draft Health Effects Documents for PFOA and PFOS.  These documents identified exposure pathways and potential health effects.  The C8 Health Project informed these documents.

97.     In May of 2016, USEPA issued its Drinking Water Health Advisories for PFOA and PFOS which considerably lowered the values from the Provisional Health Advisories.  To provide Americans with a margin of protection from a life-time of exposure to PFOA and PFOS from drinking water, the USEPA established these health advisory levels at 70 parts per trillion.

98.     On June 15, 2022, USEPA issued its Interim Updated Drinking Water Health Advisories for PFOA and PFOS replacing those issued in 2016. USEPA's data and analyses showed that negative health effects could occur at drastically lower levels than previously understood when the agency issued its 2016 health advisories for PFOA and PFOS.  The new science underpinning the 2022 Health Advisories indicates that negative health effects may occur with concentrations of PFOA or PFOS in drinking water at levels that are near zero.

99.     Based on this new information, USEPA set the Interim Updated Drinking Water Health Advisory levels orders of magnitude lower at 0.004 ppt for PFOA and 0.02 ppt for PFOS. These health advisories are set below any reliable levels of both detection and quantitation. This means that it is possible for PFOA or PFOS to be present in drinking water at levels that exceed USEPA health advisories even if testing results indicate that no amount of the PFAS are detected.

100.    On March 14, 2023, the USEPA proposed National Primary Drinking Water regulations for PFOA, PFOS, perfluorononanoic acid (PFNA), hexafluoropropylene oxide dimer acid (HFPO-DA, commonly known as GenX Chemicals), perfluorohexane sulfonic acid (PFHxS), and perfluorobutane sulfonic acid (PFBS).

101.    The USEPA proposes to set the Maximum Contaminant Level (MCL) in drinking water for both PFOA and PFOS at 4.0 ppt.  These proposed MCL's approach the lowest concentration that can be reliably measured.  Due to the continued risk of negative health effects, the USEPA also proposes to set the maximum contaminant level goal (MCLG) for PFOA and PFOS at zero.

## H.  IMPACTS OF AFFF ON ASHLAND

### a.  ASHLAND'S PUBLIC WATER SYSTEM

102.    Ashland is the administrator, owner, operator and/or actual possessor of a public water supply system with the obligation to maintain, operate, and supervise the water systems and the

authority to sue relative thereto.

103.    Ashland operates the public community water system, Ashland Water Works (PWS ID KY0100011), providing drinking water to its citizens.

104.    The source from which the public water system draws drinking water has a high vulnerability to contamination due to the absence of hydrogeologic barriers (i.e. clay) that can prevent contaminant migration.

105.    Ashland relies solely on these source(s) for its drinking water supply.  There are not alternative sources of drinking water available to meet the needs of Ashland.

106.    Ashland samples its public water system for PFAS in accordance with UCMR-5. Analytical results from these sampling events show that PFAS contamination impacts the public water system (PWS ID KY0100011).

107.    Upon information and belief, PFAS, including PFOA and PFOS, contaminate Plaintiff's drinking water source(s) due to AFFF storage, release, use, and/or disposal within the source waters' recharge areas and/or watersheds.

108.    Plaintiff's public water system, including the drinking water supply source, will require extensive sampling, delineation, and remediation for PFAS contamination.

109.    Plaintiff will need to upgrade its public water system to comply with anticipated future PFAS regulations.

### b.  ASHLAND'S WASTEWATER SYSTEM

110.    Ashland is the administrator, owner, operator and/or actual possessor of a waste water system and/or stormwater system with the obligation to maintain, operate, and/or supervise the systems and the authority to sue relative thereto.

111.    The wastewater and/or storm water system consists of various sewer lines, storm drains,

pumping stations, and a treatment plant.

112.    Ashland must treat wastewater and/or storm water prior to discharge to remove AFFF-based PFAS contamination in order to avoid additional damages to natural resources and its drinking water supply.

113.    Plaintiff will need to upgrade its wastewater and/or storm water system to comply with anticipated future PFAS regulations.

### c.  ASHLAND'S OTHER PUBLIC PROPERTIES, FACILITIES AND NATURAL RESOURCES

114.    Ashland is the administrator, owner, operator and/or actual possessor of various public properties and facilities with the obligation to maintain, operate, and/or supervise these properties and facilities. Ashland has authority to sue relative to these public properties and facilities.

115.    Due to AFFF use and storage within its borders, Ashland will need to fully sample its public properties, facilities, and natural resources in order to delineate any PFAS contamination caused by Defendants' AFFF Products and remediate all impacted areas.

116.    The injuries to Plaintiff caused by Defendants' conduct constitutes an unreasonable interference with, and damage to the natural resources of Ashland. Plaintiff's interests in protecting its natural resources constitute a reason for seeking damages sufficient to restore such resources to their pre-contamination condition, in addition to the other damages sought herein.

### PLAINTIFF IS ENJOINED FROM BRINGING CERTAIN CLAIMS

### 1.  INJUNCTION PREVENTS CERTAIN CLAIMS AGAINST 3M COMPANY DEFENDANTS

117.    Plaintiff, as an owner-operator of an AFFF impacted public water system is a Phase I Eligible Claimant for the Settlement Agreement between Public Water Systems and 3M Company agreed to on June 30, 2023. As a Phase I Eligible Claimant, Plaintiff is enjoined by Paragraph VIII

of this Court's Preliminary Approval Order "from filing or prosecuting any litigation that asserts a Released Claim in any forum or jurisdiction (whether federal, state, or otherwise) against any of the Released Parties." (Doc. 3626)

118.    Regardless of any language contained within this Complaint, in accordance with this Court's Preliminary Approval Order (Doc. 3626 ¶ VIII), Plaintiff is expressly not bringing any "Released Claims" against any "Released Parties" as those terms are defined in the Settlement Agreement between Public Water Systems and 3M Company and copied below:

    a.   "Released Claims" means (i) any Claim that may have arisen or may arise at any time in the future out of, relates to, or involves PFAS that has entered or may reasonably be expected to enter Drinking Water or any Releasing Party's Public Water System, including any Claim that (a) was or could have been asserted in the Litigation and that arises or may arise at any time in the future out of, relates to, or involves Drinking Water or any Releasing Party's Public Water System; (b) is for any type of relief with respect to the design, engineering, installation, maintenance, or operation of, or cost associated with, any kind of treatment, filtration, remediation, management, investigation, testing, or monitoring of PFAS in Drinking Water or in any Releasing Party's Public Water System; or (c) has arisen or may arise at any time in the future out of, relates to, or involves any increase in the rates for Drinking Water that any Releasing Party or Public Water System charges its customers; (ii) any Claim that has arisen or may arise at any time in the future out of, relates to, or involves the development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application, or use of PFAS or any product (including AFFF) manufactured with or containing PFAS (to the extent such Claim relates to, arises out of, or involves PFAS); (iii) any Claim that has arisen or may arise at any time in the future out of, relates to, or involves any Releasing Party's transport, disposal, or arrangement for disposal of PFAS-containing waste or PFAS containing wastewater, or any Releasing Party's use of PFAS-containing water for irrigation or manufacturing; (iv) any Claim that has arisen or may arise at any time in the future out of, relates to, or involves representations about PFAS or any product (including AFFF) manufactured with or containing PFAS (to the extent such Claim relates to, arises out of, or involves PFAS); and (v) any Claim for punitive or exemplary damages that has arisen or may arise at any time in the future out of, relates to, or involves PFAS or any product (including AFFF) manufactured with or containing PFAS (to the extent such Claim relates to, arises out of, or involves PFAS).

    b.   "Released Parties" means 3M and its respective past, present, or future administrators, advisors, affiliated business entities, affiliates, agents, assigns, attorneys, constituent corporation or entity (including constituent of a constituent)

absorbed by 3M in a consolidation or merger, counsel, directors, divisions, employee benefit plans, employee benefit plan participants or beneficiaries, employees, executors, heirs, insurers, managers, members, officers, owners, parents, partners, partnerships, predecessors, principals, resulting corporation or entity, servants, shareholders, subrogees, subsidiaries, successors, trustees, trusts, and any other representatives, individually or in their corporate or personal capacity, and anyone acting on their behalf, including in a representative or derivative capacity. It is the intention of this Agreement that the definition of "Released Parties" be as broad, expansive, and inclusive as possible.

119.    Except for the "Released Claims", Plaintiff brings all any and all claims available to it under the law and pled herein against the "Released Parties" named as Defendants.

### 2. INJUNCTION PREVENTS CERTAIN CLAIMS AGAINST DUPONT DEFENDANTS

120.    Plaintiff, as an owner-operator of an AFFF impacted public water system is a Phase I Eligible Claimant for the Settlement Agreement between Public Water Systems and defendants The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., and E.I. DuPont de Nemours and Company n/k/a EIDP, Inc. As a Phase I Eligible Claimant, Plaintiff is enjoined by Paragraph 29 of this Court's Order for Preliminary Approval of the Settlement Agreement "from filing or prosecuting any Claim in any forum or jurisdiction (whether federal, state, or otherwise) against any of the Released Persons." (Doc. 3603)

121.    Regardless of any language contained within this Complaint, in accordance with this Court's Preliminary Approval Order (Doc. 3603, ¶ 29), Plaintiff is expressly not bringing any "Released Claims" against any "Released Persons" as those terms are defined in the Settlement Agreement between Public Water Systems and defendants The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., and E.I. DuPont de Nemours and Company n/k/a EIDP, Inc. which are copied below:

a.  "Released Claims" means any and all Claims arising out of or relating to conduct by, or liability of, Released Persons before the Settlement Date, (i) that arise from or relate to PFAS that entered Drinking Water of a Public Water System within the Settlement Class, its Water Sources, its facilities or real property, or any of its Test

Sites at any time before the Settlement Date (as set forth in Paragraph 12.6); (ii) that arise from or relate to the development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application, or use of PFAS alone or in products that contain PFAS as an active ingredient, byproduct, or degradation product, including AFFF; (iii) for any type of relief with respect to the installation, maintenance, or operation of, and cost associated with any kind of treatment, filtration, remediation, testing, or monitoring of PFAS by any Settlement Class Member with respect to PFAS that entered Drinking Water of a Public Water System within the Settlement Class, its Water Sources, its facilities or real property, or any of its Test Sites at any time before the Settlement Date (as set forth in Paragraph 12.6); or (iv) that were or could have been asserted in the Litigation (all of the foregoing Claims, the "Released Claims").

b.  "Released Persons" means defendants The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., and E.I. DuPont de Nemours and Company n/k/a EIDP, Inc and (a) all past or present, direct or indirect, predecessors, successors (including successors by merger or acquisition), parents (including intermediate parents and ultimate parents), subsidiaries, affiliated or related companies or business entities, divisions, partnerships, or joint ventures of each Settling Defendant; and (b) all past or present officers, directors, shareholders, employees, partners, trustees, representatives, agents, servants, insurers, attorneys, subrogees, predecessors, successors, or assignees of any of the above.

122.    Except for the "Released Claims", Plaintiff brings any and all claims available to it under the law and pled herein against the "Released Persons" named as Defendants.

## **FIRST CAUSE OF ACTION**:

## **STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN[20]**

123.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

124.    Defendants were engaged in the business of researching, designing, manufacturing, testing, distributing, marketing, and selling PFAS Products.

125.    Defendants manufactured, marketed and/or sold AFFF or AFFF components containing PFOA and/or PFOS for use in controlling and extinguishing aviation, marine, fuel, and other flammable liquid fuel fires.

---

[20] Subject to ¶¶ 117-122

126.    Defendants knew or should have known that PFAS are hazardous to the environment and to human health.

127.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFOA and/or PFOS, was hazardous to the environment and human health.

128.    Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFAS would be used in training exercises and/or emergency situations in a manner that dangerous chemicals would be released into the environment.

129.    Further, Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFAS would be stored at military bases, fire stations, airports, and fire training facilities, and that the storage systems would likely be used and maintained in a manner that dangerous chemicals would be released into the environment.

130.    Defendants also knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and high likely to contaminate soil, surface water, and/or groundwater supplies if released into the environment.

131.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFOA and/or PFOS would result in the contamination of the natural resources, facilities, and public properties of Ashland.

132.    Plaintiff was and continues to be harmed by PFAS containing AFFF Products which were designed, manufactured, marketed, sold and/or distributed by Defendants.  These PFAS containing AFFF Products were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

133.    Defendants' PFAS containing AFFF Products did not perform as safely as an ordinary

consumer would have expected them to perform when used or misused in an intended or reasonably foreseeable way.

134.    Defendants represented, asserted, claimed and/or warranted that their PFAS containing AFFF Products could be used in conformity with accompanying instructions and labels in a manner that would not cause injury or damage.

135.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and marketers of PFAS containing AFFF Products, Defendants owed a duty to all persons whom Defendants' products might foreseeably harm, including Plaintiff, not to manufacture, sell, or market any product which is unreasonably dangerous for its intended and foreseeable uses.

136.    Defendants' PFAS containing AFFF Products marketed, sold, and utilized in Ashland were used in a reasonably foreseeable manner and without substantial change in the condition in which the products were sold.

137.    Defendants knew, or should have known, that the use of Defendants' AFFF products in their intended manner would result in the spillage, discharge, disposal, or release of PFOA and/or PFOS into the surface water, soil, and groundwater of Ashland.

138.    Furthermore, Defendants knew or should have known that their PFAS containing AFFF Products were toxic, could not be contained, and do not readily degrade in the environment.

139.    Knowing of the dangerous and hazardous properties of the AFFF, Defendants could have manufactured, marketed, and sold alternative designs or formulations of AFFF that did not contain PFAS, including PFOA and/or PFOS.

140.    Alternative designs and/or formulations of AFFF were already available, practical, and technologically feasible. The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to environment that was caused by the Defendants' manufacture,

marketing, and sale of AFFF that contained PFOA and/or PFOS.

141.    Defendants' PFAS containing AFFF Products used in Ashland were defective in design and unreasonably dangerous because, among other things: (a) PFOA and PFOS cause soil, sediment, surface water, and groundwater contamination, even when used in their foreseeable and intended manner; (b) even at extremely low levels, PFOA and PFOS render drinking water unfit for consumption; (c) PFOA and PFOS pose significant threats to public health; and (d) PFOA and PFOS create real and potential threats to the environment.

142.    Plaintiff was, is and will continue to be harmed by Defendants' defectively designed PFAS containing AFFF Products.

143.    As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of the public properties, facilities, and natural resources of Ashland, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of PFAS contamination, operating, maintenance and consulting costs, and legal fees.

## SECOND CAUSE OF ACTION:

## STRICT PRODUCTS LIABILITY – FAILURE TO WARN[21]

144.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

145.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFOA and/or PFOS, was hazardous to the environment and human health.

146.    Defendants knew or should have known that the manner in which they were manufacturing,

---

[21] Subject to ¶¶117-122

marketing, and selling AFFF containing PFAS would result in the contamination of the natural resources, facilities, and public properties of Ashland.

147.    As manufacturers, distributors, suppliers, sellers, and marketers of PFAS containing AFFF Products, Defendants had a duty to issue warnings to Plaintiff, the public, water providers, and public officials of the risks posed by PFOA and/or PFOS being released into the environment.

148.    Defendants knew that their PFAS containing AFFF Products would be purchased, transported, stored, handled, and used without notice of the hazards that PFOA and PFOS pose to human health and the environment.

149.    Defendants breached their duty to warn by unreasonably failing to provide Plaintiff, public officials, purchasers, downstream handlers, and/or the general public with warnings about the potential and/or actual contamination of the environment by PFOA and PFOS, despite Defendants' knowledge that PFOA and PFOS were real and potential threats to the environment.

150.    Defendants failed to provide sufficient warning to the end users and the public, including fire and water officials for Ashland, that the normal use and storage of Defendants' PFAS containing AFFF Products would cause the product to be released into the environment and cause contamination of the sediment, surface water, soil, and/or groundwater, with PFAS, including but not limited to PFOA and/or PFOS.

151.    Adequate instructions and warnings on the PFAS containing AFFF Products could have reduced or avoided these foreseeable risks of harm to the environment of Ashland and the threat to public health.

152.    PFAS containing AFFF Products purchased or otherwise acquired from Defendants were used, discharged, and/or released in and around Ashland, including, but not limited releases, discharges, spills, and leaks at fire stations located throughout Ashland.

153.    Had Defendants provided adequate warnings, Plaintiff and the Classes could have taken measures to avoid or lessen the exposure to the environment and natural resources of Ashland.

154.    Had Defendants provided adequate warnings, fire fighters and other end users of PFAS containing AFFF Products could have taken steps to reduce or prevent the release of toxic PFAS into the environment, surface water, soil, and/or groundwater.

155.    Defendants' PFAS containing AFFF Products were used in a reasonably foreseeable manner and without substantial changes in the condition in which the products were sold.

156.    Defendants' PFAS containing AFFF Products marketed, sold, used, and/or disposed of in Ashland were defective in design and unreasonably dangerous for the reasons set forth above.

157.    Despite the known and/or foreseeable environmental and human health hazards associated with the use and/or disposal of Defendants' PFAS containing AFFF Products in Ashland, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

158.    Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their PFAS containing AFFF Products.

159.    As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the contamination of Ashland's natural resources, facilities, and public properties by Defendants' PFAS containing AFFF Products, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of PFAS contamination, as well as operating, maintenance and consulting costs, and legal fees.

### THIRD CAUSE OF ACTION

### PUBLIC AND PRIVATE NUISANCE[22]

160.    Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the preceding paragraphs as if fully restated herein.

161.    At all times relevant to the present cause of action, Defendants were manufacturers of PFAS Products, such as AFFF containing PFOA and/or PFOS, that was used, discharged or released in a dangerous way, and/or otherwise caused PFAS contamination of the natural resources, facilities, and public properties of Ashland.

162.    Defendants owed a duty to Plaintiff to act reasonably and not put inherently dangerous products into the marketplace when they anticipated harm to natural resources and public properties.

163.    Defendants knew or should have known that PFOA and/or PFOS from AFFF would release into the environment during normal use.

164.    Through Defendants' acts and omissions, Defendants' PFAS and PFAS-containing AFFF Products have directly and proximately caused environmental contamination that has physically invaded, unreasonably interfered with, and continues to interfere with, Plaintiff's use and enjoyment of its public properties, facilities, and natural resources as detailed above.

165.    The private nuisance created by Defendants is continuing unabated.

166.    Defendants designed, manufactured, distributed, marketed, and/or sold their PFAS containing AFFF Products in a manner that created, or participated in creating, a nuisance that unreasonably endangers or injures the property, health, safety, and comfort of the general public and Plaintiff, causing inconvenience and annoyance.

---

[22] Subject to ¶¶117-122

167.    Defendants, by their acts and omissions set forth above have, among other things, knowingly unleashed long-lasting and ongoing PFOA and/or PFOS contamination and the perpetual threat of contamination to the natural resources, facilities, and public properties of Ashland as detailed above.

168.    Actual and threatened PFOA and/or PFOS contamination caused by Defendants' conduct has caused, and continues to cause, injury to Plaintiff in the form of present and serious interference with the use, benefit, and/or enjoyment of the natural resources, facilities, and public properties of Ashland in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

169.    Upon information and belief, the improper use, handling, storage, release, discharge, and/or disposal of Defendants' AFFF containing PFOS and/or PFOA has contaminated the environment, surface water, soil, sediment, and/or groundwater of Ashland, as detailed above, which constitutes an ongoing public nuisance.

170.    Plaintiff did not consent to the public nuisance and the Defendants should have known that Plaintiff would not consent to such a public nuisance.

171.    Defendants are jointly and severally responsible to abate the nuisance and ensure that the PFOA and/or PFOS contamination of Plaintiff's public properties, facilities, and natural resources, including drinking water supply sources, does not create a public health risk.

172.    Defendants' actions and omissions unreasonably interfered with, and continues to interfere with, Plaintiff's use and enjoyment of its public properties, facilities, and natural resources, including its drinking water supply sources.

173.    The above-described affirmative, voluntary, and intentional acts were performed with the reckless disregard of the potential for PFOA and/or PFOS to be disbursed throughout the

environment of Ashland, including the groundwater, surface waters, sediment, and soil.

174.    Defendants knew or, in the exercise of reasonable care, should have known that the use and introduction of their PFAS containing AFFF Products into the environment would and has continuously, unreasonably, and seriously endangered and interfered with the ordinary safety, use, benefit, and enjoyment of Plaintiff's public properties, facilities, and natural resources.

175.    As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of Plaintiff's natural resources, facilities, and public properties, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination in Plaintiff's public water system, as well as operating, maintenance and consulting costs, and legal fees.

## FOURTH CAUSE OF ACTION

### TRESPASS[23]

176.    Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the preceding paragraphs as if fully restated herein.

177.    Plaintiff is the owner of public properties and facilities located thereon, including but not limited to a public water system.  Defendants knew, or in the exercise of reasonable care should have known, that PFAS contaminates the soil, sediment surface, and groundwater, including the properties, facilities, natural resources, and other rights of Plaintiff.

178.    Defendants failed to properly warn against the use of PFAS Products such that they proximately caused and continue to cause PFOA and/or PFOS to contaminate the public properties, facilities, and natural resources of Ashland as detailed above.

---

[23] Subject to ¶¶117-122

179.   Defendants were engaged in the business of researching, designing, formulating, handling, training, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFAS containing AFFF Products and knew or should have known that the subsequent and foreseeable use and disposal of these Products would contaminate groundwater, surface water, wastewater, stormwater, sediment, and soil. Thus, the Defendants intentionally, recklessly, negligently or as the result of engaging in an extra-hazardous activity caused noxious and hazardous contaminants and pollutants to enter into groundwater, surface water, wastewater, stormwater, sediment, and soil.

180.   Upon information and belief, PFAS containing AFFF Products and PFAS compounds manufactured and/or supplied by the Defendants continue to impact Ashland's natural resources, public properties, and facilities as detailed above.

181.   The contamination of Plaintiff's natural resources, public properties, and facilities, including the impacts to the public water system, is ongoing.  PFAS continue to migrate and contaminate the public properties, facilities, and natural resources of Ashland as detailed above.

182.   Plaintiff has not consented to, and does not consent to, the trespass or contamination alleged herein.

183.   Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

184.   As a direct and proximate result of the Defendants' acts and omissions as alleged herein, Plaintiff's natural resources, public properties, and facilities have been, and continue to be, contaminated with PFAS, causing Plaintiff significant injury and damage.

185.   As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS

contamination of the natural resources, public properties, and facilities of Ashland, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of PFAS contamination, as well as operating, maintenance and consulting costs, and legal fees.

## FIFTH CAUSE OF ACTION

## NEGLIGENCE[24]

186.    Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the preceding paragraphs as if fully restated herein.

187.    Defendants knew or should have known that exposure to PFAS are hazardous to the environment and to human health.

188.    Defendants knew or should have known that PFAS were leaching into the environment from AFFF used for fire protection, training, and response activities.

189.    Defendants also knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and high likely to contaminate soil, surface water, and/or groundwater supplies if released into the environment.

190.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, distributing, and/or selling AFFF containing PFOA and/or PFOS or their chemical precursors would result in the contamination of the natural resources, public properties, and facilities of Ashland.

191.    Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFAS would be used in training exercises and/or emergency situations at military bases, fire training facilities, airports, industrial plants, and other aviation facilities, as

---

[24] Subject to ¶¶117-122

well as in live fire scenarios, in a manner that dangerous chemicals would be released into the environment.

192.    As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of PFAS Products, Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' PFAS Products might foreseeably harm, to exercise due care in the instructing, labeling, and warning of the handling, control, use, and disposal of Defendants' PFAS Products.

193.    Defendants owed a duty to Plaintiff and the Classes to act reasonably and not place inherently dangerous AFFF into the marketplace when its release into the environment, surface water, soil, and/or groundwater was imminent and certain.

194.    Defendants owed a duty to Plaintiff and the Classes not to contaminate the environment, surface water, sediment, soil, and/or groundwater of Ashland with AFFF containing toxic PFAS.

195.    Upon learning of the release of PFOA and/or PFOS in Ashland, all Defendants owed a duty to warn and notify Plaintiff of the release of said contamination before it caused injury to the natural resources, public properties, and facilities of Ashland and/or a duty to act reasonably to minimize the damages to Plaintiff.

196.    Despite the fact that Defendants knew that PFOA and PFOS are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants negligently: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold PFAS Products; (b) issued instructions on how PFAS Products should be used and disposed of, thus improperly permitting PFOA and/or PFOS to enter and contaminate natural resources, public properties, and facilities of Ashland; (c) failed to recall and/or warn the users of PFAS Products of the dangers of soil and water contamination as a result

of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings and/or recalls to the end users of PFAS containing AFFF Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their PFAS containing AFFF Products.

197.    Defendants breached their duty by allowing PFOA and PFOS to be released into the environment of Ashland and the surrounding areas through their failure to warn and notify the end users of AFFF of the danger that PFOA and PFOS would enter into the environment, surface water, soil, and/or groundwater.

198.    A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the dangers or instructed on the safe use of the PFAS containing AFFF Products.

199.    Defendants' conduct lacked any care and was an extreme departure from what a reasonable careful company would do in the same situation to prevent harm to public health and the environment.

200.    Plaintiff was, is, and will continue to be harmed by Defendants' conduct and omissions.

201.    As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of the natural resources, facilities, and public properties of Ashland, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of current PFAS contamination, as well as future operating, maintenance and consulting costs, and legal fees.

## SIXTH CAUSE OF ACTION

### ACTUAL FRAUDULENT TRANSFER[25]
### (DuPont and Chemours Co.)

202.    Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the preceding paragraphs as if fully restated herein.

203.    Through their effectuation of the Spinoff, Chemours Co. and DuPont (the "Fraudulent Transfer Defendants") caused Chemours Co. to transfer valuable assets to DuPont, including but not limited to the $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities (the "Assumed Liabilities").

204.    The Transfers and Assumed Liabilities were made for the benefit of DuPont.

205.    At the time that the Transfers were made and the Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

206.    The Fraudulent Transfer Defendants made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours Co.

207.    Plaintiff has been harmed as a result of the conduct of the Fraudulent Transfer Defendants.

208.    Plaintiff is entitled to avoid the Transfers and to recover property or value transferred to DuPont.

## SEVENTH CAUSE OF ACTION

### CONSTRUCTIVE FRAUDULENT TRANSFER[26]
### (DuPont and Chemours Co.)

209.    Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the

---

[25] Subject to ¶¶117-122
[26] Subject to ¶¶117-122

preceding paragraphs as if fully restated herein.

210.    Chemours Co. did not receive reasonably equivalent value from DuPont in exchange for the Transfers and Assumed Liabilities.

211.    Each of the Transfers and the assumption of the Assumed Liabilities by Chemours Co. was made to or for the benefit of DuPont.

212.    At the time that the Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

213.    The Fraudulent Transfer Defendants made the Transfers and assumed the Assumed Liabilities when Chemours Co. was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

214.    Chemours Co. was insolvent or in contemplation of insolvency at the time of the Transfers, or became insolvent as a result of the Transfers and its assumption of the Assumed Liabilities.

215.    At the time that the Transfers were made and Chemours Co. assumed the Assumed Liabilities, the Fraudulent Transfer Defendants intended to incur, or believed or reasonably should have believed, that Chemours Co. would incur debts beyond its ability to pay as they became due.

216.    Plaintiff has been harmed as a result of the Transfers.

217.    Plaintiff is entitled to avoid the Transfers and to recover property or value transferred to DuPont.

## EIGHTH CAUSE OF ACTION

### PUNITIVE DAMAGES[27]

218.    Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the

---

[27] Subject to ¶¶117-122

preceding paragraphs as if fully restated herein.

219.    Defendants engaged in conduct that was malicious, oppressive, and/or in reckless disregard of Plaintiff's protected rights causing the foregoing damages upon Plaintiff.

220.    Defendants' malicious, oppressive, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFAS would not be released into the environment and inevitably contaminate Plaintiff's public properties, facilities, and natural resources, including but not limited to drinking water supply sources.

221.    Defendants have caused great harm to Plaintiff, acting with implied malice and an outrageously conscious disregard for Plaintiff's rights and safety, such that the imposition of punitive damages is warranted.

## **PRAYER FOR RELIEF**

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1.  Compensatory damages according to proof including, but not limited to:

    a.  costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFAS contamination of the natural resources, facilities, and public properties of Ashland, including but not limited to equipment to continuously test public drinking water supplies;

    b.  costs and expenses related to the past, present, and future treatment, and remediation of PFAS contamination of the natural resources, facilities, and public properties of Ashland, including the purchase, installation, and maintenance of PFAS treatment equipment;

    c.  costs and expenses associated with and related to the remediation, removal, and disposal of the contamination;

    d.  costs, including expert witness fees and reasonable attorney fees attributable to producing that portion of evidence that directly relates to the claims of contamination or pollution that impacts or threatens to impact usable ground water; and

    e.  costs and expenses related to the past, present, and future installation, and maintenance of monitoring mechanisms to assess and evaluate PFAS

contamination within Ashland;

2. Punitive Damages in an amount sufficient to deter similar wrongful conduct in the future;

3. Consequential damages;

4. Costs, disbursements, and attorneys' fees of this lawsuit as provided by law;

5. Pre-judgment and post-judgment interest as provided by law;

6. An order barring the transfer of DuPont's liabilities for the claims brought in this Complaint; and

7. Any other and further relief as the Court deems just, proper, and equitable.

## **<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

Dated: January 30, 2024.

**Respectfully submitted,**

*s/ Michael G. Stag*
Michael G. Stag (LA Bar 23314)
Merritt Cunningham (LA Bar 32843)
STAG LIUZZA, LLC
365 Canal St., Ste. 2850
New Orleans, LA 70130
Phone: (504) 593-9600
Fax: (504) 593-9601
mstag@stagliuzza.com
mcunningham@stagliuzza.com

*Attorneys for Plaintiff*
